**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SCOTT E. KOCHER,

     Plaintiff,

       v.

LARKSVILLE BOROUGH, *et al.*,

     Defendants.

CIVIL ACTION NO. 3:CV-11-2053

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendants Larksville Borough, Joseph Zawadski, Tony Kopko, and John Pekarovsky's (collectively "Defendants") Motion for Summary Judgment. (Doc. 56.) Plaintiff Scott E. Kocher, a former Larksville Borough police officer, claims that he was retaliated against in violation of his First Amendment rights, deprived of a protected Fourteenth Amendment liberty interest, defamed, and cast in a false light following a confrontation with the Borough Mayor in August 2010. Because Kocher did not speak as a citizen on a matter of public concern following the confrontation, his First Amendment retaliation claim fails. Furthermore, since Individual Defendants were not personally involved in the publication of any stigmatizing material, and any dissemination was not the result of an act of a Larksville Borough policymaker or pursuant to a Borough policy or custom, the Fourteenth Amendment liberty interest claim also fails. And, because summary judgment will be granted to Defendants on all claims over which the Court has original jurisdiction, supplemental jurisdiction over the remaining state-law claims will be declined to be exercised, and the defamation and false light invasion of privacy claims will be dismissed without prejudice.

### I. Background

#### A. The Parties

Plaintiff Scott E. Kocher ("Kocher") was employed as a part-time police officer for Larksville Borough from 2004 through September 2010. (Doc. 57, *Defs.' Statement Material*

*Facts*, "*Defs.' SMF*," ¶ 1.; Doc. 75, *Pl.'s Answer Statement Material Facts*, "*Pl.'s SMF*," ¶ 1.) Kocher served as a patrol officer when he was terminated in 2010. (*Kocher Dep.*, 44:9-11.)

Defendant Joseph Zawadski ("Zawadski") has been the elected Larksville Borough Mayor since 2010. (*Defs.' SMF*, ¶ 2.) Defendant Tony Kopko ("Kopko") served as the Larksville Borough Police Chief from 1997 through the Spring of 2012. (*Id.* at ¶ 4.) Defendant John Pekarovsky ("Pekarvosky") was a member of the Larksville Borough Council at the time of Kocher's discharge from employment. (*Id.* at ¶ 3.)[1] Defendant Larksville Borough is a municipal corporation located at 211 East State Street, Larksville, Pennsylvania. (*Id.* at ¶ 5.)

## B. Larksville Borough Police Department Procedures

In 2010, patrol officers reported to Detective John Edwards ("Edwards"), Assistant Chief of Police Kofchak, or Kopko. (*Kocher Dep.*, 44:3-15, Ex. 1.) Kofchak would then report to Kopko. (*Id.* at 44:16-18.) Kopko, in turn, would report to the Mayor. (*Id.* at 44:19-24.)

The "Larksville Police Department Policies and Operating Procedures" identify certain job functions a Larksville Borough patrolman performs. (*Kocher Dep.*, Ex. 1.) For example, under the Operating Procedures, a patrolman's duties "include but are not limited to," "answer[ing] all complaints and calls for services," "investigat[ing] crimes, mak[ing] full and detailed reports of the same," and "prepar[ing] neat thorough and concise reports of all police activity." (*Id.*) The duties identified in the Operating Procedures were an accurate representation of Kocher's duties during the time he was employed with Larksville Borough. (*Id.* at 19:4-12.) While employed with Larksville Borough, Kocher would prepare police reports after incidents occurred. (*Id.* at 20:8-14.) An incident involved anything that happened in front of a police officer that would require a call to Luzerne County 911. (*Id.* at

---

[1]     Zawadski, Kopko, and Pekarovsky are the "Individual Defendants."

20:16-17.) Kocher would prepare reports for instances of arrests, and he would also prepare reports on occurrences where no arrests were made. (*Id*. at 20:18-24.)

In preparing an incident report while employed by Larksville Borough, Kocher would identify the time, date, area, and location of the incident. (*Id*. at 26:5-6.) The report would also contain a narrative of the incident. (*Id*.) Additionally, Kocher would enter his badge number when completing an incident report. (*Id*. at 74:8-10.)

A Larksville Borough Police Department incident report would be prepared through Alert, a computer program used by the Borough. (*Id*. at 28:7-12.) Incident reports were generated on computers that were located in the police station. (*Id*. at 29:10-30:8.) The reports could only be generated on these computers. (*Id*.) Reports could not be prepared on a laptop computer or an officer's home computer. (*Id*.) To access Alert, the user was required to enter a password, which prevented members of the public from using the Alert system. (*Id*.) After an incident report was completed, it would be printed out and put in a basket for filing with other incident reports. (*Id*. at 30:7-13.)

## C.    The August 13, 2010 Confrontation

On August 13, 2010, Zawadski learned that citizens were parking illegally during a church bazaar. (*Zawadski Tr.*, 197:4-6.) Kocher, who was on-duty at the time, was called to the bazaar to handle the parking issue around 7:00 p.m. (*Kocher Dep.*, 68:13-15.) Kocher responded that he was busy handling another call. (*Id*. at 69:1-2.) Kocher ultimately arrived at the bazaar at approximately 9:00 p.m. (*Id*. at Ex. 5.)

Zawadski testified that he asked to speak with Kocher after he arrived at the bazaar (*Zawadski Tr.*, 204:8-18.) The two men walked behind an ambulance, at which time Zawadski questioned Kocher as to why it took over an hour to get to the bazaar. (*Id*.) Kocher indicated that he was busy in Plymouth. (*Id*.) Although Zawadski may have pointed his fingers at Kocher, he never made contact with him. (*Id*.) Father Jerry approached

Zawadski and Kocher while they were speaking and asked if he could help, but Zawadski responded that it was a personal matter. (*Id*. at 205:21-206:7.)

According to Kocher, at approximately 9:02 p.m., officers were dispatched to the bazaar for a fight in the parking lot. (*Kocher Dep.*, Ex. 5.)  As he pulled up to the bazaar, he observed Zawadski performing what looked like a traffic stop. (*Id*.)  Kocher proceeded to the area of the fight. (*Id*.)

Kocher was standing at the entrance to the bazaar with Michael Thomas, Jeffrey Gibson, Sean Riley, Joseph Yosh, and Susan Stevenson when Zawadski approached and directed Kocher to speak with him. (*Id*.)  The two men moved a few feet away.  Zawadski, with his finger pointed to Kocher's chest, told Kocher that he was the boss and to follow his orders. (*Id*.) Zawadski also stated to Kocher that charges were going to be brought against him. (*Id*.)  During the encounter, Zawadski made physical contact with Kocher. (*Id*. at 85:1-2.)

Many bazaar attendees witnessed the encounter. (*Id*. at Ex. 5.)  Kocher stated that the confrontation escalated to the point that the church priest and Officer Thomas came between Kocher and Zawadski. (*Kocher Dep.*, 62:21-24.)  Everything was broken up, and the encounter ended with Kocher and Zawadski shaking hands. (*Id*. at Ex. 5.)

Later, while still at the bazaar, Kocher informed Kopko, who was off-duty at the time, about the confrontation. *(Kocher Dep.*, 62:24.)  Kopko told Kocher that Zawadski should have been arrested. (*Id*. at 62:25-63:7)  Kopko further instructed Kocher to cover himself. (*Id*. at 78:8-9.)  Kocher documented the encounter in a written incident report (the "Incident Report") based on his conversation with Kopko. (*Id*.)  Kocher also prepared the Incident Report because he feared that he would be terminated as a result of the confrontation. (*Id*. at 62:25-63:7.)  After he completed the Incident Report, he printed out two copies. (*Id*. at 78:16-79:4.)  Kocher kept one copy for himself.  The other copy was placed in the basket

with the other incident reports. (*Id*.)  Zawadski saw the Incident Report after it was placed in the filing basket. (*Zawadski Tr.*, 193:10-19.)

Kocher also spoke with Edwards about his encounter with Zawadski. (*Kocher Dep*., 89:15-91:2.)  Like Kopko, Edwards advised Kocher to prepare an incident report. (*Id*. at 90:15-19.)  Edwards also told Kocher that Zawadski should have been arrested. (*Id*. at 90:10.)

The day after the confrontation, Kocher was contacted by Pekarovsky. (*Id*. at 91:5-92:23.)  Pekarovsky told Kocher that Zawadski is the boss and to follow his orders. (*Id*. at 92:6-10.)

## D.    Events Preceding Kocher's Termination

Following the August 13, 2010 confrontation, a series of events occurred leading to Kocher's discharge.

First, Kopko determined that Kocher inaccurately documented his availability to report to the bazaar on August 13, 2010.  Kopko learned about Kocher's encounter with Zawadski on August 13, 2010. (*Kopko Tr.*, 62:11-64:2.)  The next day, Kopko reviewed the Incident Report prepared by Kocher.  He believed Kocher acted properly. (*Id*. at 63:12-15.)  Later, however, Kopko became aware that the Borough's computers were missing times for 911 calls. (*Id*. at 64:14-22.)  Kopko directed Edwards to gather information relating to the missing calls. (*Id*. at 64:3-11.)  Kopko reviewed the 911 sheets obtained by Edwards and determined that Kocher's reported times were off. (*Id*. at 63:18-20.)  Although Kocher's Incident Report reflected that he was busy the entire time when his presence was requested at the bazaar, the 911 sheets showed that Kocher had over an hour of inactivity where he could have reported to the bazaar. (*Id*. at 63:20-25.)  Based on the difference in the times reported by Kocher and revealed by the call sheets, Kopko decided to investigate if Kocher accurately reported the events from the night of August 13, 2010. (*Id*. at 80:14-21.)  He

determined that Kocher falsified his Incident Report based on the erased 911 calls. (*Id*. at 91:7-11.)  During the course of this litigation, however, a 911 supervisor testified that an individual could not erase information from the 911 Call Center. (*Adams Dep.*, 10:1-19.)

Another incident involving Kocher occurred on September 16, 2010.  Kocher was at the top of Larksville Mountain when he received a 911 call to report to Petriga's Garage. (*Kocher Dep.*, 198:6-11.)  At the time Kocher received the call, he was speaking to a Jackson Township officer. (*Id*. at 200:8-19.)  Kocher continued speaking with the officer after the call came. (*Id*. at 201:18-21.)  The next day, Kopko spoke to Mike Petriga who stated that he waited outside his garage for an officer to come, but no officer ever arrived. (*Kopko Tr.*, 119:17-20.)  Petriga testified, however, that he did not mention the lack of response to his call until two or three weeks later. (*Petriga Dep.*, 21:13-14.)

The third incident also occurred on September 16, 2010. (*Id*. at 97:19-21.)  Kopko reviewed a report prepared by Kocher involving a vehicle theft. (*Id*. at 97:22.)  Kopko spoke with the victim and her father, and he determined that the report omitted certain information. (*Id*. at 97:22-25.)  The victim also informed Kopko that she was dissatisfied with how Kocher responded to her call. (*Id*. at 98:13-16.)

## E.      The Kopko Memorandum

Kopko prepared a memorandum to the Larksville Borough Council on September 21, 2010 (the "Kopko Memorandum") regarding the termination of Scott Kocher. (*Kocher Dep.*, Ex. 9.)  With respect to the confrontation at the bazaar, Kopko noted that "he did in fact have at least one (1) hour to address the Mayor's concerns and orders.  He did not.  What he did do was lie and falsify his reports.  I found out that the 911 Center times were erased from our computer.  I was able to recover the times, proving he was lying." (*Id*.)  As to the vehicle theft on September 16, 2010, "Kocher was given vital information from a Plymouth Police Officer as to who possibly stole the vehicle and to this date not only didn't he

6

document this, he also failed to follow up on any of it." (*Id*.) Third, in regard to the September 16, 2010 incident at Petriga's Garage, "Kocher received a radio call from the 911 Center at 1:15 a.m. He never acknowledged that he arrived there nor what he did through the 911 Center." (*Id*.) Although Kocher indicated that he responded to the Petriga's Garage incident by phone, Kopko "told him that there was still no record of it. I asked him who he spoke to. He said he didn't know." (*Id*.) Kopko recommended Kocher be discharged from his employment with Larksville Borough because the Police Department "can't have an Officer that is sworn to do his duty fail to comply with this duty." (*Id*.)

## F. Kocher's Termination

Kocher was terminated from his position with Larksville Borough by the Borough Council on September 21, 2010. (*Defs.' SMF*, ¶ 53.) Prior to the vote by the Borough Council to terminate Kocher's employment, Council received the Kopko Memorandum. (*Cresho Tr.*, 31:12-14.) Zawadski, however, did not recommend that Kocher be terminated. (*Zawadski Tr.*, 221:8-10, 233:12-14.) While Kocher's termination was discussed during the Borough Council's executive session based on the contents of the Kopko Memorandum, Patricia Cresho ("Cresho"), the Borough Secretary/Treasurer, (*Cresho Tr.*, 31:15-32:17), testified that no comments were made about Kocher during the public meeting. (*Id*. at 35:1-3.) Kocher did not recall any discussion at the public meeting about his removal other than the motion to terminate his employment. (*Kocher Dep.*, 126:18-128:1.) Kocher also did not remember being accused of a crime at the public meeting. (*Id*. at 128:2-4.) Nor was Kocher aware of Councilman Pekarovsky ever publishing that Kocher committed a crime or informed other individuals about the circumstances of his termination. (*Id*. at 150:14-151:1.)

Following his termination from Larksville Borough, Kocher applied for unemployment benefits. (*Id*. at 118:19-22.) The Kopko Memorandum was provided to the Unemployment Compensation Bureau in connection with Kocher's application for benefits. (*Defs.' SMF*, ¶

62.)

## G.     The Kingston Borough Application and Investigation

In or about April 2009, Kocher applied for a full-time police officer position with Kingston Borough. (*Defs.' SMF*, Ex. 3.)  In connection with his application, Kocher signed a "Waiver and Release for Background Investigation." (*Id.*)  The waiver and release, dated April 29, 2009, was signed by Kocher and notarized by a notary public.  It states:

> I, Scott Kocher (Name of Applicant), hereby give the Municipality of Kingston the right to make a thorough investigation into my background, previous employment, education, and references in order to ascertain my suitability for service as a police officer.  I release from all liability and claims any and all persons, companies and corporations (public and private) supplying any information whatsoever to representatives of the Municipality of Kingston.  This includes and is not limited to parties with whom I have entered into a written or oral agreement which contains a confidentiality clause.  I release, indemnify and hold harmless the Municipality of Kingston, its officials, officers, and employees from and against any and all liability which might result from conducting such an investigation.

(*Id.*)

In June or July 2010, Detective Richard Kotchik ("Kotchik") was asked by Kingston Borough Police Chief Keith Keiper to conduct a background check of Kocher. (*Kotchik Dep.*, 12:25-13:20.)  Kotchik's initial investigation into Kocher's background was completed on September 4, 2010. (*Id*. at 32:1-4.)  During the course of his initial investigation, Kotchik spoke with Kopko. (*Id*. at 21:8-10.)  Kopko informed Kotchik that while Kocher could be a good officer, he was lazy and did not seem interested in being employed with Larksville Borough.  (*Id*. at 22:4-13.)  Kopko, however, did not inform Kotchik that Kocher was under investigation. (*Id*. at 25:4-10.)  Based on his background investigation, Kotchik noted that Kocher could "be a good Police Officer but may lack some motivation." (*Id*. at Ex. 3.)  Furthermore, Kotchik determined that he did "not believe and will not tell the Civil Service Commission that Scott E. Kocher is the best applicant for the position of full-time Police Officer for the Kingston Municipal Police Department." (*Id*.)

In early October 2010, Kotchik learned that Kocher's employment had been

8

terminated by Larksville Borough. (*Id*. at 39:6-15.) At the direction of his police chief, Kotchik conducted a supplemental investigation of Kocher's background. (*Id*. at 42:14-20.) Kotchik subsequently contacted Edwards to find out the reason for Kocher's termination. (*Id*. at 41:6-13.) Kotchik also spoke with Kopko. (*Id*. at 41:17-21.)

During his supplemental investigation of Kocher, Kotchik sought to review Kocher's personnel file from Larksville Borough. (*Id*. at 43:21-44:6.) Kotchik had not reviewed the personnel file during his initial investigation. (*Id*.) But, once he learned of Kocher's termination, Kotchik contacted Larksville Borough to review the file. (*Id*.) Kotchik guessed Kopko granted him permission to review the file. (*Id*. at 97:20-23.) When Kotchik first requested access to the file, Larksville Borough denied his request. (*Id.* at 49:17-50:5.) Access was only granted once he presented Kocher's signed waiver and release. (*Id*.)

On the day he reviewed Kocher's personnel file, Kotchik called Larksville Borough and spoke with Cresho before he proceeded to Larksville Borough to review the file. (*Cresho Tr.*, 9:8-13, 18:21-22.) Kotchik was at the building for approximately twenty to thirty minutes to review the file. (*Id*. at 18:23-19:4.) Cresho did not contact anyone, such as Larksville Borough Council, for permission to allow Kotchik to review the file because she was presented with the waiver and release signed by Kocher. (*Id*. at 19:5-11.) She also did not contact Kocher before permitting Kotchik to review his file. (*Id*. at 19:15.) Larksville Borough "really didn't want to give me that personnel file," according to Kotchik, but he obtained access to its contents after he supplied the waiver with his request. (*Kotchik Dep*., 43:21-44:6.) Kotchik reviewed the contents of Kocher's personnel file with Edwards. (*Id*. at 45:6-21.) That was the first and only time Kotchik saw the Kopko Memorandum. (*Id*. at 96:25-97:2.)

As a result of his additional investigation of Kocher, Kotchik prepared a supplemental report. (*Id*. at Ex. 1.) The supplemental report repeated the reasons for Kocher's

termination from Larksville Borough as set forth in the Kopko Memorandum. (*Id*.)

By letter dated November 30, 2010, Kingston Borough's Civil Service Commission informed Kocher that he was "unsuitable for appointment as a police officer with the Municipality of Kingston." (*Kocher Dep*., Ex. 11.)  The letter noted that Kocher failed his background investigation since he was terminated from his position with the Larksville Borough Police Department due to failure to perform assigned duties. (*Id*.)  The letter also provided that Kocher could appeal the decision and request a hearing before the Civil Service Commission. (*Id*.)  Kocher availed himself of the opportunity for a hearing, but his appeal was unsuccessful. (*Id*. at 133:7-135:6.)

## H.    Procedural History

Based on the foregoing events, Kocher commenced the instant action on November 3, 2011. (Doc. 1.)  On December 22, 2011, Kocher filed the Amended Complaint against Larksville Borough, Zawadski, Kopko, and Pekarvosky. (*Am. Compl*., ¶¶ 2-5.)  The Amended Complaint consists of Three Counts asserted against all Defendants: Count I- "Violation of Plaintiff Kocher's Constitutional Right to be Free from Injury to Reputation and Given Due Process Stigma-Plus Claim"; Count II- "First Amendment Retaliation"; and Count III- "False Light & Defamation." (*Am. Compl*.)  Defendants filed an Answer to the Amended Complaint on January 5, 2012. (Doc. 9.)

The litigation proceeded to discovery.  After the discovery period closed, Defendants filed a motion for summary judgment on all claims. (Doc. 56.)  Now, as Defendants' motion for summary judgment has been fully briefed, it is ripe for disposition.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence

supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. Discussion

Kocher asserts 42 U.S.C. § 1983 claims for First Amendment retaliation and Fourteenth Amendment deprivation of liberty interest in reputation. Kocher also alleges claims for defamation and false light invasion of privacy under state-law. Defendants seek summary judgment on all claims.

### A.     Section 1983 Claims

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured, . . ." 42 U.S.C. § 1983. "To

establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)). Kocher's First Amendment retaliation and Fourteenth Amendment liberty interest claims will be addressed in turn.

### 1.    First Amendment Retaliation

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, . . ." U.S. Const. amend. I.  Kocher claims he was retaliated against in violation of the First Amendment after he engaged in protected conduct.

To prevail on a First Amendment retaliation claim, a public employee must demonstrate that (1) he or she engaged in activity that is protected by the First Amendment, and (2) the protected activity was a substantial factor in retaliatory action by the employer. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)).  "The first factor is a question of law; the second factor is a question of fact." *Id*.

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *See Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) (citing, *inter alia, Pickering v. Board of Education of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) and *Rankin v. McPherson*, 483 U.S. 378, 384, 107

S. Ct. 2891, 97 L. Ed. 2d 315 (1987)).  The Supreme Court has identified two inquiries to guide interpretation of the constitutional protections afforded to public employee speech. *Id*. at 418, 126 S. Ct. 1951.  "The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on her or his employer's reaction to the speech." *Id*. (citing *Connick*, 461 U.S. at 147, 103 S. Ct. 1684).  But, "if the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*.  According to the Third Circuit, these inquiries should proceed in the following three steps to ascertain whether a public employee's speech is protected by the First Amendment:

> First, as a threshold issue, we must determine whether the employee's speech was made pursuant to his or her official duties, and therefore was unprotected by the First Amendment, or whether it was constitutionally protected speech made as a citizen.  If the speech was not made pursuant to an employee's official duties, we proceed to the analysis set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), and consider whether "the employee spoke as a citizen on a matter of public concern."  If the answer to that question is yes, we must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  In other words, we strive to "'arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"

*Morris v. Phila. Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012) (internal citations omitted).

Defendants argue that Kocher did not speak as a citizen, that his speech consisted solely of a personal grievance, and that no causal connection existed between his allegedly protected activity and the purported retaliatory action.

### a.  Speech Pursuant to Official Duties

The Supreme Court held in *Garcetti* that a public employee does not "speak as a citizen" when he makes a statement pursuant to his "official duties." *Garcetti*, 547 U.S. at

14

421, 126 S. Ct. 1951; *see also Sexton v. Cnty. of York*, No. 12-CV-0402, 2012 WL 2192250, at *4 (M.D. Pa. June 14, 2012). "Restricting speech that owes its existence to a public employee's professional responsibilities," according to the Supreme Court, "does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421, 126 S. Ct. 1951. Stated differently, the First Amendment does not shield the consequences of "expressions employees make pursuant to their professional duties." *Id*. at 426, 126 S.Ct. 1951. Thus, "the critical fact is whether the activity or speech performed by a public employee is within the scope of [the employee's] routine operations." *Sexton*, 2012 WL 2192250, at *4 (citations omitted). "Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Id*. (citing *Foraker v. Chaffinch*, 501 F.3d 231, 241-42 (3d Cir. 2007)).

Defendants contend that Kocher cannot satisfy the threshold inquiry for his First Amendment retaliation claim because he was not speaking as a citizen when he prepared the Incident Report or reported Zawadski's conduct to Kopko. Specifically, Defendants argue that Kocher prepared the Incident Report pursuant to his official duties with the Larksville Borough Police Department. Kocher first disputes Defendants' formulation of the applicable inquiry for whether he engaged in protected conduct. Kocher argues that the threshold question is whether his speech involved a matter of public concern, without addressing whether he spoke pursuant to his official duties. Restated, Kocher offers that he "simply needs to show this Court that his speech was a matter of public concern, which he has done since even Citizen Stevenson stated that the Mayor's behavior on the day in question was a matter of public concern." (Doc. 74, 5 n.1.)

Kocher's position is inconsistent with *Garcetti* and ignores recent Third Circuit case law establishing that the threshold inquiry in a public employee free speech case is whether the employee's speech was made pursuant to his or her official duties. *See, e.g., Morris*,

487 F. App'x at 39  ("as a threshold issue, we must determine whether the employee's speech was made pursuant to his or her official duties, and therefore was unprotected by the First Amendment, . . ."); *Brown v. Montgomery Cnty.*, 470 F. App'x 87, 89 (3d Cir. 2012) ("[the plaintiff's] reports were made pursuant to his official duties, and his statements do not receive First Amendment protection."); *Fulmer v. Pennsylvania*, 460 F. App'x 91, 93 (3d Cir. 2012) ("*Garcetti* directs us to consider, as a threshold question, whether the employee spoke pursuant to official duties.").  Consistent with these decisions, the threshold issue in resolving Kocher's First Amendment retaliation claim is whether he was speaking as a private citizen when he informed Kopko of the confrontation or when he prepared the Incident Report.  If the answer is yes, then, under *Garcetti*, the possibility of a First Amendment claim arises. *See Garcetti*, 547 U.S. at 418, 126 S. Ct. 1951.

Defendants argue that Kocher did not speak as a private citizen when he authored the Incident Report and/or informed Kopko of the Mayor's conduct on August 13, 2010. Defendants assert that Kocher prepared the Incident Report at the direction of his supervisors, Kopko and Edwards.  And, the report was prepared on an official Larksville Borough incident report form, which identified his badge number and provided a detailed account of the August 13, 2010 events.   After completing the Incident Report, Kocher placed the report in a filing bin in the same manner as all other incident reports.  Defendants also emphasize that the Incident Report was prepared on a software program contained on Larksville Borough Police Department computers.  The program is password protected, thereby preventing members of the public from accessing the program and preparing similar reports.

Defendants cite an unpublished opinion from the United States District Court for the District of New Jersey in support of their claim that Kocher prepared the Incident Report pursuant to his official duties.  In *Gattison v. Twp. of Irvington*, No. 05-1759, 2007 WL

4591354, at *1 (D. N.J. Dec. 31, 2007), the plaintiff, a police officer, claimed that his direct supervisor requested him to alter a police report. The plaintiff refused. *See id*. The plaintiff then filed a report with Internal Affairs. *See id*. at *2. After he filed the report, the plaintiff claimed the defendants retaliated against him by filing insubordination charges and transferring him to a different position. *See id*.

The defendants' motion for summary judgment on the plaintiff's First Amendment retaliation claim was granted because the plaintiff "was acting within his employment duties in communicating the alleged misconduct of his fellow officers to appropriate police personnel." *Id*. at *4. Specifically, the district court noted that the plaintiff used a department report sheet to report the alleged police corruption and misconduct, the report was signed by the plaintiff using his official rank and badge number, and the plaintiff officer acknowledged that he had a duty to report illegal or unethical conduct. *Id*. The district court also rejected the plaintiff's argument that he was not acting within his employment duties because he did not have a duty to falsify police reports or cover up wrongful arrests. *See id*. In finding that the plaintiff had a duty to report misconduct, the district court reasoned:

> There is nothing in the record to indicate that Gattison was acting in any other capacity than as a police officer when he made any of his reports, and no evidence that he was acting as a private citizen. To the contrary: in using an official report sheet to communicate, Gattison wasn't communicating the way an ordinary citizen would (or could). He was writing a report to superiors as an employee, an activity that does not qualify for the same constitution-based scrutiny as the speech of a citizen. And if writing his report was an act of an employee of the Police Department, Gattison necessarily subjected himself to discipline by his superiors.

*Id*. Defendants contend that these similarities compel the same conclusion in this case: Kocher prepared the Incident Report pursuant to his official duties as a Larksville Borough police officer.

In opposition, Kocher argues that Defendants' reliance on *Gattison* is misplaced. According to Kocher, the plaintiff in *Gattison* "conceded that if a police officer sees unethical or illegal conduct, the officer has a duty to report that individual." *Id*. at *4. In this case,

17

however, Kocher claims that his list of job duties does not identify a duty to report "official misconduct of the mayor." (*Kocher Dep*., 267:13-19.) Thus, Kocher contends that *Gattison* is inapposite to the matter at hand because he "denied that he has a duty as a police officer to report the Mayor's misconduct." As a result, he concludes that the preparation of the Incident Report was private citizen speech. In addition, Kocher argues that he spoke as a citizen when he verbally complained to Kopko, who was off duty at the time, about Zawadski's behavior directly after the incident occurred on August 13, 2010.[2]

While the Supreme Court has yet to "articulate a comprehensive framework for defining the scope of an employee's duties" for which First Amendment protection will not attach, the Court has indicated that "[t]he proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424, 126 S. Ct. 1951. The *Garcetti* Court rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." *Id*. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id*. at 424-25, 126 S. Ct. 1951. The Third Circuit has interpreted this passage as "escew[ing] the use of formal job descriptions to determine whether speech was made pursuant to an employee's official duties." *Morris*, 487 F. App'x at 37.

Applying these principles, the record demonstrates that Kocher's complaint to Kopko

---

[2]     Defendants note that the Amended Complaint identifies the allegedly protected conduct to be the preparation and filing of the Incident Report, without mentioning the verbal complaint to Kopko. Furthermore, Kocher fails to identify any authority that renders the fact that Kopko was off-duty when Kocher informed him of the confrontation to be a material distinction under *Garcetti*. Indeed, this is inconsistent with the facts in this case, where Kocher insinuated that Kopko, as police chief, was on duty "24/7." (*Kopko Tr.*, 76:22-77:14.)

and his authoring of the Incident Report occurred pursuant to his official duties as a Larksville Borough police officer. As noted, "whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Foraker*, 501 F.3d at 240; *Baranowski v. Waters*, No. 05-1379, 2008 WL 4000406, at *19 (W.D. Pa. Aug. 25, 2008) (interpreting "mixed question of fact and law" to mean that "the ultimate question of whether speech is made pursuant to a public employee's official duties is a question for the Court to decide, whereas the question of whether certain factual circumstances exist is a question amenable to resolution by a jury."). As a Larksville Borough police officer, Kocher was expected to investigate crimes, and to also make full and detailed reports of such crimes. Kocher was further required to prepare thorough and concise reports of all police activities. Kocher testified that he would prepare such reports after incidents occurred, which included preparing reports on occurrences when no individuals were arrested. (*Kocher Dep.*, 19:4-20:24.) Kocher also believed Zawadski's conduct was unlawful and that he should have been arrested. (*Id*. at 78:8-12, 113:14-25.)

Kocher, nevertheless, asserts that he "does not have an official job duty reporting abusive behavior by a public official." (*Plf.'s SMF*, ¶ 9.)[3] Kocher relies on the fact that his

---

[3]     Defendants argue that an examination of Kocher's deposition testimony reveals that he, in fact, admitted to having an official duty to report Zawadski's misconduct. (Doc. 76, 6.) The testimony does not show such a clear admission:

> Question [Ms. Pollick- Plaintiff's Counsel]: Now, we looked at Kocher Exhibit 1. Nowhere on this first sheet- I'm only going to look at the first one which is the job duties. Does it state that you have to report official misconduct of the mayor? That's one of your official duties, correct?

> Mr. Brown [Defendants' Counsel]: Objection to Form.

> The Witness [Kocher]: Correct.

> (*Kocher Dep.*, 267:13-19.)

job description does not identify "a job task of reporting official misconduct." (Doc. 74, 7.)[4] Kocher's argument is in direct conflict with *Garcetti*. As stated, the *Garcetti* Court emphasized that "the listing of a given task in an employee's written job description is *neither necessary* nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424, 126 S. Ct. 1951 (emphasis added). In arguing that reporting official misconduct was not part of his job function, Kocher advances the position expressly rejected by the Supreme Court- that his job description conclusively establishes whether his actions occurred within the scope of his professional duties.[5]

      Instead, applying the "practical" inquiry envisioned by *Garcetti*, the evidence

---

[4]    Kocher also suggests the testimony of his supervisors that Zawadski should have been arrested by Kocher or another officer that witnessed the confrontation indicates that he had no official duty to report the Mayor's misconduct. (Doc. 74, 8-9; *see also Kopko Tr.*, 146:9-23; *Kocher Dep.*, 90:9-10.) It seems that the converse holds true. That is, because Kocher's superiors believed that Zawadski should have been arrested, the testimony implies that Kocher (or the other officers that witnessed the confrontation) had an official duty to arrest or cite the Mayor. And, as Kocher testified that he had an obligation to prepare incident reports for occurrences taking place in his presence even if no arrests were made, (*Kocher Dep.*, 8:24), the testimony of his superiors supports the conclusion that Kocher had an official duty to report Zawadski.

[5]    An illustration from the job description of a Larksville Borough patrolman, (*Kocher Dep.*, Ex. 1), makes it easy to understand why the Supreme Court rejected the position advanced by Kocher. For example, the listed duties for a Larksville Borough patrolman include "answer[ing] all complaints and calls for services" and "investigat[ing] crimes." (*Id.*) Absent from the listed duties, however, is an obligation to patrol the Borough streets, say by foot or vehicle, as necessary to ensure the safety of the community. Even without such an identified duty, it seems difficult to envision a scenario where a borough patrolman would not be expected to patrol the streets of the municipality where he or she is employed. Yet, under the analysis offered by Kocher, this would be exactly the result: a patrolman would not have a duty to patrol the streets of Larksville Borough because it is not expressly set forth in the job description for the position.

establishes that Kocher was acting in his capacity as a police officer when he informed Kopko about Zawadski's conduct and authored the Incident Report. Here, Kocher prepared the Incident Report on an official Larksville Borough incident report form. The Incident Report included his badge number. And, when the Incident Report was completed, it was placed in a filing bin in the same manner as all other incident reports. Furthermore, it is undisputed that a private citizen could not access Larksville Borough's computer program to prepare a report on an official Larksville Borough form. Finding Kocher's authoring of the report to be part of his official duties is also consistent with his testimony that Zawadski engaged in unlawful behavior, because, as a police officer, Kocher was expected to investigate and prepare incident reports detailing unlawful activity.

Based on this record, Kocher's speech occurred pursuant to his official duties with Larksville Borough. Summary judgment will be granted to Defendants on the First Amendment retaliation claim.

### b.    Matter of Public Concern

Assuming, *arguendo*, that Kocher's speech was not within the scope of his official duties with Larksville Borough, Defendants are entitled to summary judgment on the First Amendment claim because Kocher did not speak on a matter of public concern.

"An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *See Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (quoting *Connick*, 461 U.S. at 146, 103 S. Ct. 1684). Whether speech can be fairly characterized as addressing a matter of political, social, or other community concern requires consideration of the content, form, and context of the speech. *Id.* (citing *Connick*, 461 U.S. at 146-48, 103 S. Ct. 1684). "The content of the speech may help to characterize it as relating to a matter of social or political concern of the community if, for example, the speaker seeks to 'bring to

21

light actual or potential wrongdoing or breach of public trust' on the part of government officials." *Id*. (quoting *Connick*, 461 U.S. at 148, 103 S. Ct. 1684).  "This means that public speech cannot 'constitute merely personal grievances.'" *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003) (quoting *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994)). Thus, "speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1271 (3d Cir. 1994).

Defendants argue that the Incident Report prepared by Kocher complains only about perceived mistreatment by his supervisor, *i.e.*, Zawadski yelled at him.  Defendants further characterize the Incident Report as merely addressing issues over the managerial prerogative of Zawadski, without setting forth any complaints about the practices or policies of the Larksville Borough Police Department.  Relying on *Bell v. City of Phila.*, 275 F. App'x 157, 159 (3d Cir. 2008), Defendants argue that Kocher's "complaints- which sought not to expose discriminatory or harassing practices or polices . . . but [instead] complained solely about his own 'abuse' and mistreatment by superiors and co-workers- were not a matter of public concern, . . ."

Conversely, Kocher argues that speech about a public official's misconduct is a matter of public concern pursuant to *O'Donnell v. Yanchulis*, 875 F.2d 1059 (3d Cir. 1989), and *Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir. 2000).  In *O'Donnell*, the plaintiff, the chief of police, claimed township supervisors retaliated against him after he refused to fix or withdraw citations issued against their friends and other select individuals.  *See O'Donnell*, 875 F.2d at 1061.  He subsequently informed a local television station of the demands of the supervisors.  *See id*. at 1060.  The Third Circuit found the allegations of "corrupt practices by government officials [to be] of the utmost public concern" as they seek to "bring to light actual or potential wrongdoing or breach of public trust." *Id*. at 1061 (citation

and internal quotation omitted).

Similarly, in *Baldassare*, the plaintiff, an investigator in a county prosecutor's office, alleged that he was retaliated against for participating in an investigation of alleged criminal activity by other members of the office. *See Baldassare*, 250 F.3d at 192-93. The Third Circuit determined that the plaintiff's investigation constituted a matter of public concern because "our jurisprudence makes clear that an internal investigation into the alleged criminal actions of public employees 'falls squarely within the core public speech delineated in *Connick*.'" *Id*. at 196-97 (quoting *Swineford*, 15 F.3d at 1271). Significantly, the court noted that the determination of whether the matter addresses an issue of public concern focuses "on the nature of the information" and whether "'the message conveyed would be relevant to the process of self-governance if disseminated to the community, . . .'" *Id*. at 197 (quoting *Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 977-78 (3d Cir. 1997) (en banc)).

Unlike the plaintiffs in the authority relied on by Kocher, his speech in this case did not shed light on corrupt government practices or inform the community of breaches of the public trust. The Incident Report documented a confrontation between Kocher and Zawadski, witnessed by members of the public, that described an event where a uniformed police offer was mistreated and yelled at in public by the elected Mayor. The nature of the information set forth in the Incident Report did not identify such "corrupt practices" found by the Third Circuit in *O'Donnell* and *Baldassare* to address matters of public concern. Rather, as noted by Defendants, this situation is much more akin to the facts in *Bell* where the Third Circuit concluded that complaints about an individual's own "mistreatment by superiors and co-workers" were not a matter of public concern for First Amendment purposes. *See Bell*, 275 F. App'x at 159.

Accordingly, as Kocher did not speak as a citizen on a matter of public concern, Defendants are entitled to summary judgment on the First Amendment retaliation claim.

### c. Causation

To establish the requisite causal connection for a retaliation claim predicated on the First Amendment, the plaintiff "usually must prove one of two things: (1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link." *DeFranco v. Wolfe*, 387 F. App'x 147, 155 (3d Cir. 2010) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Because Kocher has failed to demonstrate that he spoke as a citizen on a matter of public concern, it is unnecessary to explore the causation element of his First Amendment retaliation claim. Defendants' motion for summary judgment will be granted with respect to the First Amendment retaliation claim.

### 2. Fourteenth Amendment Liberty Interest

The Fourteenth Amendment of the United States Constitution provides that a state may not "deprive any person of life, liberty, or property, without due process of law, . . ." U.S. Const. amend. XIV, § 1. Kocher argues that Defendants deprived him of a liberty interest in his reputation.

The Supreme Court held in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971) that an individual has a protectable interest in reputation. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id*. at 437, 91 S.Ct. 507. Courts "subsequently clarified, however, that 'reputation alone is not an interest protected by the Due Process Clause.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quoting *Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1371 (3d Cir. 1993)). But, a plaintiff may make out a due process claim for deprivation of a liberty interest in reputation by showing "'a stigma to his reputation plus deprivation of some additional right

or interest.'" *Dee v. Borough of Dunmore*, 549 F.3d 225, 233-34 (3d Cir. 2008) (quoting *Hill*, 455 F.3d at 236).

"In the public employment context, the 'stigma-plus' test has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." *Hill*, 455 F.3d at 236 (quoting *Codd v. Velger*, 429 U.S. 624, 628, 97 S. Ct. 882, 51 L. Ed. 2d 92 (1977)). "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'" *Id*.

To satisfy the "stigma" prong, the purportedly stigmatizing statements must have been made publically and be false. *Id*. (citations omitted); *see also Brown v. Montgomery Cnty.*, 470 F. App'x 87, 91 (3d Cir. 2012) (to establish the "stigma" prong, the employee must show: "1) publication of 2) a substantially and materially false statement that 3) infringed upon the reputation, honor, or integrity of the employee.").

The Third Circuit has noted that "[w]hat is required to satisfy the 'plus' prong of the test in the public employment context is more equivocal." *Hill*, 455 F.3d at 237. However, "when a public employee bases his 'plus' on government conduct that does not implicate a state law-created property interest, the employee nonetheless satisfies the 'stigma-plus' test if he can establish that he was 'defamed in the course of being terminated or constructively discharged.'" *Dee*, 549 F.3d at 234 n.11 (quoting *Hill*, 455 F.3d at 238).

In moving for summary judgment, Defendants contend that no purportedly stigmatizing statements have been made public as a result of the conduct of the named Defendants.

### a. The Allegedly Stigmatizing Publications

Kocher argues that the stigmatizing charges were made publically on multiple occasions. First, he claims that the stigmatizing information was disseminated on

September 21, 2010, the day he was terminated by the Larksville Borough Council. Second, Kocher argues that the stigmatizing information was made public when it was placed in his personnel file and when it was actually transmitted to a prospective employer. Third, he claims that it was made public when it was transmitted to the Unemployment Compensation Bureau in connection with his application for benefits. This claim will be addressed as to Larksville Borough and Individual Defendants separately because, as noted by Defendants, their conduct must all be viewed individually to determine if they participated in the alleged denial of Kocher's constitutional rights. *See, e.g., Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) ("The precedent in our circuit requires the district court to review the plaintiff's municipal liability claims independently of the section 1983 claims against the individual [defendants].").

## i. The Fourteenth Amendment Claim Against the Borough

Larksville Borough's liability for the Fourteenth Amendment liberty interest claim implicates the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). In *Monell*, the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S. Ct. 2018. Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694, 98 S. Ct. 2018. A policy is a decision of a municipality's "duly constituted legislative body" or of "officials whose acts may fairly be said to be those of the municipality." *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). A custom is a practice that, although "not . . . formally approved by an appropriate decisionmaker . . . is so widespread as to have the

force of law." *Id*. at 404, 177 S. Ct. 1382.

To establish a *Monell* claim against a municipality, "[a] plaintiff must identify the challenged policy, attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 797 (5th Cir. 1984)); *see also Kriss v. Fayette Cnty.*, No. 12-1156, 2012 WL 5816867, at *3 n.2 (3d Cir. Nov. 16, 2012) ("plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal policy or custom that caused the plaintiff's injury."); *Briston v. Cnty. of Allegheny*, No. 08-1380, 2011 WL 635267, at *6 (W.D. Pa. Feb. 11, 2011) ("inability to advance facts sufficient to identify an existing policy . . . precludes the ability to establish *Monell* liability.").

### a)      Publication at the September 21, 2010 Meetings

First, Kocher argues that stigmatizing information was made public on the day of his termination.  This claim is simply not supported by the record.  Here, the evidence shows that all discussions about Kocher's termination on September 21, 2010 occurred during a private executive session meeting. (*Cresho Tr.*, 31:12-32:17.)   Indeed, the Larksville Borough Secretary testified that discussions about Kocher's discharge and the Kopko Memorandum occurred during the executive session as "nothing would have been said derogatory in an open public meeting." (*Id*. at 32:19-33:9.)  Kocher even testified that at the public meeting he attended, he could only recall that a motion was made to terminate his employment, the motion was seconded, and his termination was approved. (*Kocher Dep.*, 126:18-127:14.)  Kocher did not remember any other information being discussed at the public meeting about his discharge, and he similarly did not recall being accused of a crime during the public meeting. (*Id*. at 127:15-128:4.)  Kocher, therefore, cannot establish the "stigma" prong of his "stigma-plus" claim with respect to discussions by Larksville Borough officials at the September 21, 2010 meetings. *See, e.g., Knaub v. Tulli*, 788 F. Supp. 2d 349, 355 (M.D. Pa. 2011) ("remarks made to the board for the purpose of inducing Plaintiff's firing are not public and hence fail to satisfy that aspect of the stigma-plus test.").

**b)      Transmission of the Personnel File's Contents**

Kocher next asserts that the stigmatizing accusations contained in the Kopko Memorandum were made public when they were placed in his personnel file since they were likely to be disseminated to a prospective employer.  Kocher argues that this amounts to publication pursuant to the United States  Court of Appeals for the Second Circuit's decision in *Brandt v. Bd. of Co-op. Educ. Servs.*, 820 F.2d 41 (2d Cir. 1987).  In *Brandt*, the plaintiff claimed that the presence of sexual misconduct charges in his personnel file satisfied the "public disclosure" requirement for a deprivation of liberty interest claim because "prospective employers will want to know about his qualifications as a teacher, will gain access to the file, and 'will most certainly not hire him' when they learn of the charges." *Id*. at 44.  The Second Circuit held that if the plaintiff "is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities." *Id*. at 45.  The Second Circuit further noted that if the plaintiff "authorizes the release of his personnel file, the potential employer would find out about the allegations of sexual misconduct and propably not hire him.  If he refuses to grant authorization, that, too, would hurt his chances for employment." *Id*.  Pursuant to this reasoning, Kocher argues that Defendants' motion for summary judgment on his "stigma-plus" claim should be denied.

Third Circuit precedent establishes that the presence of stigmatizing information in a personnel file, alone, is not sufficient publication to establish a deprivation of liberty interest in reputation under the Fourteenth Amendment.  In *Cooley v. Pa. Hous. Fin. Agency*, 830 F.2d 469, 470 (3d Cir. 1987), *abrogated on other grounds by Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207 (3d Cir. 1991), the plaintiff was terminated from his employment with the defendant.  The reasons for his discharge were outlined in a letter stating that his conduct on the job had not conformed to agency standards.  The plaintiff

28

commenced the action asserting, among other claims, a deprivation of his liberty interest predicated on the basis that "the termination letter from the PHFA to him was defamatory and was allegedly placed in his personnel file, thereby disseminating it to potential employers and foreclosing his freedom to pursue future employment." *Id*. at 473. The Third Circuit affirmed the district court's grant of summary judgment on the liberty interest claim to the defendant. *See id*. at 474-75. Specifically, the court noted that the plaintiff failed to offer "any evidence of actual dissemination of his termination letter or its contents to future employers." *Id*. at 474; *but see Perri v. Aytch*, 724 F.2d 362, 367 (3d Cir. 1983) ("Perri alleges that the false accusation made in connection with her termination impugns her good character and reputation, is part of her personnel file, and can reasonably be expected to be communicated to prospective employers and prevent her from obtaining alternative employment. If true, these conditions would require the employer to provide procedural safeguards."). Likewise, no evidence was presented "with regard to the regular procedures of the agency in responding to requests by future employers." *Cooley*, 830 F.2d at 474. Thus, because the plaintiff failed to "proffer evidence sufficient to prove publication, a required element of his cause of action," the Third Circuit found summary judgment in favor of the defendant was warranted. *Id*. at 475.

The Third Circuit addressed a similar claim the following year in *Copeland v. Phila. Police Dep't*, 840 F.2d 1139 (3d Cir. 1988). In *Copeland*, the plaintiff claimed that the defendant deprived him of his liberty interest in reputation when information relating to his termination was placed in his personnel file. *See id*. at 1148. The plaintiff alleged that the presence of the information in his personnel file raised an inference that city intended to communicate the information to prospective employers, and that this inference was strengthened by the fact that he was unable to find employment for over a year following his termination. *See id*. The Third Circuit affirmed the district court's grant of summary

judgment to the defendant because "[s]uch assertions are . . . insufficient to defeat a motion for summary judgment. Copeland has thus failed to produce the evidence necessary to support his assertion that the city violated his liberty interest." *Id*.

*Cooley* and *Copeland* stand for the proposition that the mere placement or presence of stigmatizing information in a personnel file, without more, does not violate an individual's liberty interest in reputation under the Fourteenth Amendment. Rather, as indicated by *Cooley*, a plaintiff must show "evidence of the standard procedures or actual transmission to future employers" to establish the necessary publication element for a deprivation of liberty interest in reputation claim. *Cooley*, 830 F.2d at 475.

Kocher, unlike the plaintiffs in *Cooley* and *Copeland*, has demonstrated the transmission of the allegedly stigmatizing information to a prospective employer.[6] Larksville Borough argues that the claim still fails since there is no evidence of record that the Kopko Memorandum was transmitted by way of a Borough policy, custom, or employee implementing an official policy or practice.

An individual's conduct implements official policy or practice when:

> (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 246 (3d Cir. 2006) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-84, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986); *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005); *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125-26 (3d Cir. 2003)). Larksville Borough contends that no formal policy, act of a final

---

[6]      Kocher, however, has not identified Larksville Borough's "regular" or "standard" procedures in responding to requests by prospective employers to view personnel files.

policymaker, or ratification by a final policymaker can be found to be responsible for the transmission of Kocher's personnel file to Kingston Borough.

### i) Larksville Borough Policy or Custom

Larksville Borough argues that there is no direct causal link between a "municipal policy or custom" and the alleged deprivation of Kocher's liberty interest. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214-15 (3d Cir. 2001). In opposition, Kocher contends that Larksville Borough is liable for its failure to train Secretary Cresho and Kopko.

Kocher's failure to train theory fails for two reasons. First, it was raised for the first time in his brief opposing the instant motion for summary judgment. "[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Village Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)); *see also Dewees v. Haste*, 620 F. Supp. 2d 625, 635 (M.D. Pa. 2009) ("to the extent Plaintiff is attempting to expand upon his original allegations through argument in his brief it is impermissible."); *Anderson v. Consol-Pennsylvania Coal Co.*, 740 F. Supp. 1126, 1130 (W.D. Pa. 1990) ("we will not allow plaintiffs to expand their theory of the case at this late date in an effort to avoid summary judgment."). Here, Kocher's Amended Complaint cannot be read to raise a failure to train theory of liability against Larksville Borough, and, therefore, his brief in opposition is impermissibly attempting to expand upon his original allegations.

Second, even considering the failure to train theory, Kocher has not established "deliberate indifference" to his rights. *See Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) ("Where, as here, the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."). A three-part test applies to determine if a municipality's failure to train amounts to "deliberate indifference": "(1) municipal policymakers know that employees will

confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id*. (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)).

Simply put, Kocher has not pointed to any evidence in the record that Larksville Borough's alleged failure to train amounted to "deliberate indifference" towards his constitutional rights. The record does not show that any of Larksville Borough's policymakers knew that its employees would confront a request by a prospective employer with a signed waiver and release to review a former employee's personnel file. *See, e.g., Doe v. Luzerne Cnty.*, 660 F.3d 169,180 (3d Cir. 2011) ("The record does not demonstrate that any of the County's policymakers knew that its employees would likely confront a situation implicating the violation of one's right to privacy when videotaping certain activities. "). Likewise, there is no evidence showing a history of Borough employee's mishandling requests for access to personnel files. *See id*. ("Similarly, the record is devoid of any evidence that there has been a history of County employees mishandling the production of training videos or videotaping in general; indeed, there is no evidence that there has ever been another incident like the one Doe experienced."). In fact, there has been no indication that there has been another incident like the one involving Kocher. Thus, any failure by Larksville Borough to train its employees did not amount to "deliberate indifference" to Kocher's constitutional rights. *See id*.[7]

---

[7]     As noted, Kocher has also not presented any evidence that Larksville Borough had a policy, standard procedure, or custom of providing prospective employers with access to personnel files. Rather, the evidence shows only that the contents of a personnel file were released on a single occasion pursuant to a signed waiver and release. "A custom under *Monell* can usually not be established by a one-time occurrence." *Soloman v. Phila. Hous. Auth.*, 143 F. App'x 447, 457 (3d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)). A § 1983 cause of action for a custom or policy based on a single decision attributable to a municipality has been recognized by the Supreme Court "only where the causal link between the municipality's conduct and the harm is clear, where, for example, the municipality itself specifically authorizes or directs

### ii)    Larksville Borough Policymakers

Second, a municipality may be liable where no rule has been announced as policy but federal law has been violated by the act of a policymaker itself. *Hill*, 455 F.3d at 245. In order to ascertain if an official has final policymaking authority and can bind the municipality by his or her conduct, "a court must determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, . . . and (2) whether the official's authority to make policy in that area is final and unreviewable." *Id*. (internal citations omitted). "'The question of who is a policymaker is a question of state law,' to be addressed by a court, not a jury, in 'determin[ing] which official has final, unreviewable discretion to make a decision or take an action.'" *B.S. v. Somerset Cnty.*,- - - F.3d - - -, 2013 WL 69211, at *19 n.36 (3d Cir. 2013) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990)).

In moving for summary judgment, Larksville Borough argues that there is no evidence of record that the Borough Secretary, the employee that granted Kingston Borough access to Kocher's personnel file, had final policymaking authority such that her conduct represented the official policy of Larksville Borough. Further, it also argues that to the extent that Kopko disseminated information to Kingston Borough, there is no evidence that he had final policymaking authority. Kocher disputes Larksville Borough's claim that Kokpo lacked final policymaking authority.

In *Santiago v. Warminster Twp.*, 629 F.3d 121, 134-35 (3d Cir. 2010), the Third Circuit affirmed the district court's dismissal of the *Monell* claim against the township defendant because the plaintiff failed to allege sufficient facts that the police chief was a

---

the deprivation." *Downton v. Phone*, 441 F. App'x 91, 92 (3d Cir. 2011) (citing *Bryan*, 520 U.S. at 405-06, 117 s. Ct. 1382); *see also Brown v. City of Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009) ("The rationale for this rule is straightforward. '[A] single incident of police misbehavior by a single policeman is insufficient as sole support for an inference that a municipal policy or custom caused the incident.'"). Here, Kocher has failed to offer any evidence to create such a causal link.

final policymaker under *Monell*. In affirming the dismissal of the claim, the Third Circuit noted that the complaint did not identify "what action [the police chief] took that could fairly be said to be policy." *Id*. at 135. In addition, the Third Circuit held that even if the plaintiff had adequately alleged that the police chief had final policymaking authority, it would not matter because "as a matter of Pennsylvania law, a township Police Chief is not a final policymaker." *Id*. at 135 n.11 (citing 53 Pa. Stat. Ann. § 66902 (vesting authority over the "organization and supervision" of township police officers with the township board of supervisors); *Hicks v. Warminster Township*, No. Civ. A. 00–2895, 2001 WL 1159750, at *3 (E.D. Pa. July 26, 2001) ("In such townships, all of the policymaking power, including over the local police force, is vested in the town supervisors.")). Furthermore, "'the Supreme Court has forbidden courts from assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.'" *Id*. (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 125 n.1, 126, 108 S. Ct. 915, 99 L. Ed. 2d 107(1988)).

*Santiago* instructs against the presumption that all municipal police chiefs in the Commonwealth are final policymakers. And, the relevant portions of the Pennsylvania Borough Code indicate that a borough Police Chief is not a final policymaker. *See* 53 Pa. Stat. Ann. § 46123.1.[8] Instead, "[t]he mayor shall have full charge and control of the chief of police and the police force." *Id*. at § 46123.1(a). And, while "[t]he mayor may delegate to the chief of police . . . supervision over and instruction to subordinate officers in the manner of performing their duties," *Id*. at §46123.1(c), Kocher has not cited any evidence of record that the Larksville Borough Mayor delegated authority to the Police Chief. In fact, even Kocher testified that Kopko reported to Zawadski. (*Kocher Dep.*, 44:19-24.) Likewise, similar to the plaintiff in *Santiago*, while Kocher broadly argues that Kopko had policymaking

---

[8] Prior to 2012, the powers of a borough mayor in regard to the police chief were set forth in 53 Pa. Stat. Ann. § 46121. Section 46121 was "substantially reorganized and subdivided for clarity" in 2012. *Id*. at § 46121 cmt. 2012. "The powers of a mayor in regards to the police chief and police force are relocated to new section 1123.1." *Id*.

34

authority, he fails to identify what action could fairly be said to be Larksville Borough policy. *See Santiago*, 629 F.3d at 135. Thus, Plaintiff has failed to establish that Kopko was a final policymaker for Larksville Borough.[9]

### iii)     Ratification

Lastly, a municipality may be liable "if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citing *Praprotnik*, 485 U.S. at 127, 108 S. Ct. 915); *see also LaVerdure*, 324 F.3d 125-26 (even if individual lacks final policymaking authority to bind the municipality, municipality may be liable if it delegates the individual the authority to act or if it acquiesced to the conduct). Ratification occurs only "'when a subordinate's decision is subject to review by the municipality's authorized policymakers [because] they have retained the authority to measure the official's conduct

---

[9]     The authority relied on by Kocher in support of his claim that Kopko was a final policymaker predates *Santiago* and is factually distinguishable. For example, in *Gallis v. Borough of Dickson City*, No. 05-551, 2006 WL 2850633, at *8 (M.D. Pa. Oct. 3, 2006), the chief of police was found to be a final policymaker based upon his own testimony that he was the "chief executive officer" with "final decision-making authority." Kocher does not identify any similar evidence in this case. In *Nudleman v. Borough of Dickson City Police Dep't*, No. 05-1362, 2007 WL 3275259, at *4 (M.D. Pa. Nov. 6, 2007), unlike the evidence presented here, the chief of police agreed that he had "a demonstrated history of formulating policy . . . ." Similarly inapposite is *Cimino v. Borough of Dunmore*, No. 02-1137, 2005 WL 3488419, at * (M.D. Pa. Dec. 21, 2005), where the police chief "compiled the employee handbook for the police department, including rules, regulations, and standard operating procedures." Again, the record is devoid of any testimony implicating similar conduct by the Larksville Borough Police Chief. And, in *Savokinas v. Borough of Avoca*, No. 07-2311, 2010 WL 235132, at *4 (M.D. Pa. Jan. 19, 2010), the plaintiff presented evidence that the chief of police was a final policymaker based on the Borough Council President's testimony that "the police chief had the responsibility to run the police department, supervise the police officers and implement procedures such as evidence handling." These cases differ significantly from the instant action because they all involved evidence that the chief of police had final policymaking authority. But, in this case, Kocher has simply argued that Kopko was a final policymaker without supplying *any* evidence to substantiate his claim.

for conformance with their policies.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010) (quoting *Praprotnik*, 485 U.S. at 127, 108 S. Ct. 915). "'Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.'" *Id.* (quoting *Prapotnik*, 485 U.S. at 130, 108 S.Ct. 915).

Here, Kocher has failed to identify any evidence that Larksville Borough's policymakers were aware that Borough employees disseminated Kocher's information to Kingston Borough. Likewise, no evidence is shown that these employees were delegated authority to transmit such information. Indeed, the Borough Secretary testified that she did not contact Borough Council prior to providing Kingston Borough's investigator access to Kocher's personnel file. (*Cresho Tr.*, 19:5-11.) At most, it can be said that Larksville Borough's policymakers went along with the discretionary decision by the Borough Secretary to provide Kingston Borough access to a personnel file on a single occasion. Such conduct is insufficient to establish municipal liability as to Larksville Borough.

Based on the foregoing, Kocher has failed to establish that the dissemination of the contents of his personnel file to Kingston Borough occurred pursuant to a Larksville Borough policy, practice, or custom.[10] Larksville Borough is entitled to summary judgment

---

[10] To the extent that he claims that the allegedly stigmatizing Kopko Memorandum was made public in connection with his application for unemployment benefits, Kocher has not cited any authority for the proposition that dissemination of information pursuant to his own request for unemployment benefits constitutes publication for a "stigma-plus" claim. *Contra Beatty v. Thomas*, No. 05–71, 2005 WL 2757934, at *5 (E.D. Va. Oct. 24, 2005) ("this Court finds that the information given to the Virginia Unemployment Commission was not made public since it was initiated by Plaintiff's own request to a government agency for employment benefits. . . . Since the communication was not made public, it cannot properly form the basis for a claim that Plaintiff's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."); *Luy v. Baltimore Police Dep't*, 326 F. Supp. 2d 682, 691 (D. Md. 2004) ("Luy does not allege that these statements were 'made public by his employer,' except through internal communications to BPD employees and in submissions to the DLLR pursuant to Luy's request for unemployment benefits, and these disclosures are not sufficient.").

on the Fourteenth Amendment "stimga-plus" claim.

### ii. The Fourteenth Amendment Claim Against Individual Defendants

Kocher also claims that Individual Defendants are liable for the alleged deprivation of his liberty interest in reputation. A "defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "It is uncontested that a government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct." *Argueta v. U.S. I.C.E.*, 643 F.3d 60, 71–72 (3d Cir. 2011). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id*. at 72 (quoting *Rode*, 845 F.2d at 1207). Alternatively, a supervisor may also be held liable under § 1983 if it is shown that he or she "established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Thus, supervisory liability may be imposed under § 1983 only if "the connection between the supervisor's directions and the constitutional deprivation [is] sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue." *Santiago*, 629 F.3d at 130.

### a) Publication at the September 21, 2010 Meetings

As discussed above, there was no publication of any stigmatizing information at the Borough Council meetings when Kocher was terminated. Kocher, therefore, cannot establish a "stigma-plus" claim against Individual Defendants predicated on comments made about his termination on September 21, 2010 at the Borough Council meetings.

### b) Transmission of the Personnel File's Contents

Pursuant to *Cooley,* 830 F.2d 469*,* and *Copeland*, 840 F.2d 1139, the mere placement of stigmatizing information in a personnel file does not violate a public employee's liberty interest in reputation. And, even if placing the stigmatizing information

37

in the personnel file in this case constituted publication for Kocher's Fourteenth Amendment liberty interest claim, summary judgment would still be proper with respect to Individual Defendants on the claim because there is no evidence that the information was placed in the personnel file by Zawadski, Pekarovsky, or Kopko. As stated, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved. . . ." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir.2007) (internal quotations and citations omitted). As to Zawadski and Pekarovsky, while the evidence shows that the Kopko Memorandum was given to the Borough Council and the Mayor on September 21, 2010, Kocher has not identified any evidence of record that either of these Defendants placed, directed someone to place, or established a policy or practice resulting in the placement of documents in personnel files. Thus, Zawadski and Pekarovsky did not personally participate in any violations of Kocher's constitutional rights which occurred as the result of the placement of the Kopko Memorandum in his personnel file. *See, e.g., Bellard v. Gautreaux*, 675 F.3d 454, 463 (5th Cir. 2012) ("there is no indication that any letter of termination was ever placed in his personnel file, and if so, whether it was placed there by the Sheriff. Proof of personal placement would be needed to hold the Sheriff individually liable, . . ."). And, although it is clear that Kopko authored the allegedly stigmatizing document, Kocher has cited no evidence that Kopko was responsible for preserving the Memorandum in his personnel file. That is, Kocher has not demonstrated that the Kopko Memorandum was placed in his personnel file by Kopko personally, by someone at his direction, or as a result of a policy, practice, or custom he established.

With regard to the transmission of the personnel file's contents to Kingston Borough, Individual Defendants contend that they are nevertheless entitled to summary judgment because: (1) they did not personally participate in the dissemination to Kingston Borough; and (2) the transmission was reasonable based on the waiver and release signed by Kocher.

As to Pekarovsky, the evidence of record establishes only that: (1) he told Kocher

on August 14, 2010 that Zawadski was the boss and to follow his orders; and (2) he was a member of the Borough Council at the time Kocher's employment with Larksville Borough was terminated. (*Kocher Dep.*, 91:2-92:10.) These actions do not demonstrate that Pekarovsky had personal involvement in the publication of the allegedly stigmatizing information in Kocher's personnel file to Kingston Borough.

The record is similarly devoid of any evidence that Zawadski disseminated the allegedly stigmatizing Kopko Memorandum. While Zawadski reviewed the Kopko Memorandum and went along with the recommendation for Kocher to be terminated, (*Zawadski Tr.*, 242:16-20), Kocher has not cited any evidence that Zawadski participated in the dissemination of stigmatizing information to Kingston Borough. And, to the extent that he suggests Zawadski is liable as a supervisor for the conduct of Larksville Borough employees, Kocher has not identified any evidence that Zawadski "directed others to violate" his rights, or that he "as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago*, 629 F.3d at 129.

Finally, with respect to Kopko, it is undisputed that he authored the allegedly stigmatizing document in Kocher's personnel file. While Kotchik guessed that he had Kopko's permission to view the personnel file, (*Id*. at 49:22-24, 97:23), he was provided with access only after the waiver and release was presented to Larksville Borough. (*Id*. at 43:21-44:6.) In that regard, it is uncontradicted that Larksville Borough permitted Kingston Borough to review the file only because of Kocher's signed waiver and release. (*Cresho Tr.*, 19:10-11.) And, the evidence is clear that Kopko was not present when Kotchik reviewed the contents of the file. (*Kotchik Dep.*, 45:14-16.) Based on this evidence, Kocher has not demonstrated that Kopko personally participated in the transmission of the allegedly stigmatizing information to Kingston Borough or directed others to disseminate the Kopko Memorandum.

The evidence presented in this case instead demonstrates that the allegedly stigmatizing Kopko Memorandum was provided to Kingston Borough by a Larksville Borough employee that is not a party to this action. As the Borough Secretary testified, she

permitted Kotchik to review the personnel file's contents only after he presented a release and waiver signed by Kocher. (*Cresho Tr.*, 19:10-11.) Furthermore, the only other Larksville Borough employee present when Kotchik reviewed the contents of the file was Edwards, another individual that is not a named defendant in this matter. (*Kotchik Dep.*, 45:16.) Edwards obtained permission from Cresho, and not Kopko, prior to allowing Kotchik to inspect the file. (*Edwards Dep.*, 79:3-8.)  Because there is no evidence that Individual Defendants, as supervisors, authorized or knowingly acquiesced to this transmission, Individual Defendants are not responsible for the actions of Cresho or Edwards.

Accordingly, as Individual Defendants were not personally involved in disseminating the information to Kingston Borough, Kocher has failed to establish the necessary publication element of his "stigma-plus" claim with respect to these Defendants.  Individuals Defendants are therefore entitled to summary judgment on Kocher's Fourteenth Amendment claim.

### c) The Waiver and Release

Kocher also argues that "Defendants should not be allowed to shield themselves from their actions based on an unenforceable waiver since it is against public policy, Defendants are not named, and there was no consideration that is required for every contract made in the state of Pennsylvania." (Doc. 74, 26.)  Specifically:

> Defendants fail to cite any authority for the proposition that Plaintiff waives his legal right to sue Defendants by virtue of a [sic] signing an authorization form for a background check to another entity, which he received no consideration from Defendants nor Kingston Borough.  Here, Plaintiff did not give Larksville Borough or any other official his consent to publicize the false defamatory statements made during his termination.  Neither did he receive monetary recompense in exchange for his authorization to Kingston Borough.

(*Id*. at 27.)

Upon review of the parties' submissions, Defendants have not claimed that the waiver and release absolved them from all liability in this action.  Instead, they cite the waiver and release only to support their argument that they acted reasonably in permitting Kotchik to review the contents of the personnel file.  Thus, whether the waiver and release absolved Defendants of liability need not be addressed because such an argument has not

40

been raised. However, were the enforceability of the waiver and release to be considered, it would be determined by considering the totality of the circumstances test adopted by the Third Circuit in *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir.1988), *superseded by statute on other grounds, as recognized in Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1539 (3d Cir.1997). *See Devore v. City of Phila.*, No. 04-3050, 2008 WL 2178909, at *6-*7 (E.D. Pa. Sept. 7, 2005).[11]

### d) Qualified Immunity

Even if any Individual Defendants participated in transmitting the personnel file to Kingston Borough, summary judgment would still be warranted because they are entitled to qualified immunity. The Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). "Thus, we ask: (1) whether the facts alleged by the

---

[11]    The factors to be considered in determining the validity of a release are:

> (1) the clarity and specificity of the release language; (2) the Plaintiff's education and business experience; (3) the amount of time the Plaintiff had for deliberation of the release before signing it; (4) whether Plaintiff knew or should have known of [his] rights upon execution of the release before signing it; (5) whether Plaintiff was encouraged to seek, or in fact received, the benefit of counsel; (6) whether there was opportunity for negotiation of the terms of the agreement; (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled to by law; (8) the absence of fraud or undue influence.

> *Devore*, 2005 WL 2178909, at *6 (quoting *Cirillo*, 862 F.2d at 451). In *Devore*, a case involving a release similar to that in this action, the former employer defendant claimed "with respect to the prospective employment with the PSP, . . . the waiver signed by the Plaintiff, that permitted the City to release his personnel information to the PSP, absolved it from all liability." The district court denied the defendant's motion for summary judgment due to the "bizarre circumstances" of the case, which included the disclosure of discipline records that the defendant "should not have had in its possession" pursuant to a prior settlement agreement between the parties.

41

plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010). Courts may address the two *Saucier* prongs in any order, at their discretion. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). If the plaintiff fails to satisfy either prong, the defendant is entitled to judgment as a matter of law. *See id*. at 232, 129 S. Ct. 808.

A legal right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id*. (citations omitted). This prong "of the qualified immunity analysis therefore 'turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Pearson*, 555 U.S. at 243, 129 S. Ct. 808). "'[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.'" *Bayer v. Monroe County Children and Youth Serv.*, 577 F.3d 186, 193 (3d Cir.2009)

A clearly established right does not require that "there be binding precedent from this circuit" when "the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211–12 n.4 (3d Cir. 2001). Thus, "'the absence of a previous decision from our court on the constitutionality of the conduct at issue is not dispositive' in determining whether the particular constitutional right at issue was clearly established at a particular time, . . ." *Pro v. Donatucci*, 81 F.3d 1283, 1292 (3d Cir. 1996) (quoting *Bieregu v. Reno*, 59 F.3d 1445, 1459 (3d Cir. 1995)). In that regard, the Third Circuit "routinely considers decisions by other Courts of Appeals as part of [the] 'clearly established' analysis when we have not yet addressed the right asserted by the plaintiff." *Williams v. Bitner*, 455 F.3d 186,

192–93 (3d. Cir. 2006) (citing *Kopec v. Tate*, 361 F.3d 772, 777–78 n.6 (3d Cir. 2004); *Brown*, 269 F.3d at 211–12 n.4).

Here, placing the Kopko Memorandum in Kocher's personnel file did not violate his constitutional rights, *see Copeland*, 840 F.2d at 1148; *Cooley*, 830 F.2d at 474-75, because "the mere 'presence' of information in a personnel file, without more, is insufficient to require due process." *Sciolino v. City of Newport News*, 480 F.3d 642, 648 (4th Cir. 2007) (citing *Copeland*, 840 F.2d at 1148).[12]

---

[12]     What constitutes disclosure of a personnel file's contents is subject to debate:

> Some courts hold that a personnel file containing the stigmatizing statement must actually have been disseminated to a potential employer. *See Johnson v. Martin*, 943 F.2d 15, 16-17 (7th Cir. 1991); *cf. Burton v. Town of Littleton*, 426 F.3d 9, 15 n. 5 (1st Cir. 2005) (noting that to prove dissemination a "plaintiff must marshal sufficient evidence to support a conclusion that any of the prospective employers requested, or that the defendants divulged, information regarding the circumstances surrounding [her] termination" (internal quotation marks omitted) (alteration in original)).  Others hold that the mere "presence" of information in a personnel file, without more, is insufficient to require due process. *Hughes v. City of Garland*, 204 F.3d 223, 228 (5th Cir. 2000); *Copeland v. Philadelphia Police Dep't*, 840 F.2d 1139, 1148 (3d Cir. 1988).  Still others require only that the file "would be available to prospective employers," *Clark v. Mann*, 562 F.2d 1104, 1116 (8th Cir. 1977); that there must be a "possibility" that potential employers will see the information, *Bailey v. Kirk*, 777 F.2d 567, 580 n. 18 (10th Cir. 1985) (citing *Burris v. Willis Indep. Sch. Dist.*, 713 F.2d 1087, 1092 (5th Cir. 1983)); or that the "presence of stigmatizing information" in a personnel file was part of the public record and so could be obtained by prospective employers, even though it had not been disseminated to any particular employer, *Buxton v. City of Plant City*, 871 F.2d 1037, 1045-46 (11th Cir. 1989).  The Second Circuit requires, as the district court did here, a likelihood that the files would be seen by potential employers. *See Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44-45 (2d Cir. 1987) ("[T]he public disclosure requirement has been satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers.").

*Sciolino*, 480 F.3d at 648.

Furthermore, the claimed unlawfulness of any dissemination by Individual Defendants of information in Kocher's personnel file pursuant to a signed waiver and release was not clearly established in 2010. Kocher claims that Individual Defendants are not entitled to qualified immunity by simply stating that a "stigma-plus" claim is clearly established. This statement, however, fails to "define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006)).

In this case, a reasonable official would not have believed that an individual's liberty interest in reputation would be violated by disclosing the contents of a personnel file pursuant to a signed waiver and release. While Kocher identifies a case which contemplated that an employee's liberty interest in reputation could be violated in such a scenario because he or she would be compelled to provide access to the personnel file, *see Brandt v. Bd. of Co-op. Educ. Servs.*, 820 F.2d 41 (2d Cir. 1987) ("In applying for jobs, if Brandt authorizes the release of his personnel file, the potential employer would find out about the allegations of sexual misconduct and probably not hire him. If he refuses to grant authorization, that, too, would hurt his chances for employment"), there is a "dearth of precedent of sufficient specificity (and factual similarity to this case) . . . to say that the constitutional right . . . alleged [to be] violated was clearly established." *McKee v. Hart*, 436 F.3d 165, 173 (3d Cir. 2006). Thus, permitting a prospective employer to review the contents of Kocher's personnel file pursuant to the signed waiver and release was objectively reasonable in light of the legal rules established at that time. Qualified immunity, therefore, provides an additional reason for granting Individual Defendants' motion for summary judgment on the "stigma-plus" claim.

## B.    State-Law Claims

Kocher's remaining claims are under state-law for defamation and false light invasion of privacy. District courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

A district court may refuse to exercise such jurisdiction where, as in the instant case, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In fact, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995).

Here, there is no affirmative justification for exercising supplemental jurisdiction beyond any ordinary inconvenience associated with dismissal on this ground. Therefore, as Kocher's constitutional claims will be dismissed, I will decline to exercise supplemental jurisdiction over the remaining state-law claims. These claims will be dismissed without prejudice to allow Kocher to re-file them in state court if he so desires.

## IV. Conclusion

For the above stated reasons, Defendants' motion for summary judgment will be granted as to Plaintiff Scott Kocher's § 1983 claims, and judgment will be entered in Defendants' favor on these claims. Supplemental jurisdiction over the remaining state-law claims will be declined, and the defamation and false light invasion of privacy claims will be dismissed without prejudice.

An appropriate order follows.


 February 20, 2013                                    /s/ A. Richard Caputo
Date                                                 A. Richard Caputo
                                                     United States District Judge